NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4644-17T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MICHAEL GUERINO,
a/k/a MICHAEL GIERINO,
MICHAEL GUARINO, and
CHRIS GUERINO,

      Defendant-Appellant.

_____

> Argued telephonically May 18, 2020 –
> Decided September 3, 2020
>
> Before Judges Ostrer, Vernoia and Susswein.
>
> On appeal from the Superior Court of New Jersey,
> Law Division, Ocean County, Indictment No. 16-04-
> 0672.
>
> Margaret McLane, Assistant Deputy Public Defender,
> argued the cause for appellant (Joseph E. Krakora,
> Public Defender, attorney; Margaret McLane, of
> counsel and on the briefs).
>
> Samuel Marzarella, Chief Appellate Attorney, argued
> the cause for the respondent (Bradley D. Billhimer,
> Ocean County Prosecutor, attorney; Samuel
> Marzarella, of counsel; Shiraz Deen, Assistant
> Prosecutor, on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant, Michael Guerino, appeals from his jury trial convictions for first-degree robbery, aggravated assault, unlawful possession of a knife, and other charges associated with the armed robbery of a Dollar Tree. He was sentenced to an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a) and received a twenty-five-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

The identity of the knife-wielding robber was the key disputed issue at trial. The assistant store manager, who was stabbed in the back and suffered a minor injury during the robbery, was a critical prosecution witness. The outcome of the trial hinged to a large extent on her testimony identifying defendant as the robber-assailant.

Defendant raises several contentions with respect to the victim's out-of-court and in-court identifications. Defendant claims, for example, police improperly administered a photo array procedure. He also argues the victim's memory was tainted when the prosecutor two weeks before trial arranged for her to view defendant in person as he was led with other county jail inmates through a courthouse corridor. Defendant urges us not only to exclude the

2

victim's in-court identification in this case but also to abolish outright the familiar trial practice in which a witness identifies the perpetrator in the presence of the jury.

In addition to raising various contentions concerning out-of-court and in-court eyewitness identification procedures, defendant contends the trial court erred by allowing the jury to hear inadmissible testimony and by excluding hearsay testimony the defense sought to elicit during the cross examination of a detective. Defendant also challenges the sentence that was imposed.

After carefully reviewing the record in light of the applicable principles of law and the arguments of the parties, we conclude most of defendant's arguments lack merit and afford no basis for appellate relief. Two of defendant's contentions relating to out-of-court identification procedures, however, cannot be resolved on the current record. The trial court convened a N.J.R.E. 104 hearing at which the victim described how she was asked to come to the courthouse to observe county jail inmates, including defendant, as they were paraded into a courtroom. That identification procedure was not recorded in accordance with Rule 3:11. We believe the N.J.R.E. 104 hearing did not adequately address the inherent suggestiveness of this novel identification procedure and the court did not make specific findings concerning system variables that may have influenced the victim's recollection.

We therefore deem it necessary to remand the case for the trial court to convene a Wade-Henderson[1] hearing to more closely examine the circumstances and impact of the unusual live lineup conducted in a courthouse corridor. We also remand for the trial court to review the circumstances in which the victim selected defendant's photograph from the photo array. A Wade-Henderson hearing is warranted because a critical part of the procedure—the moment when the victim positively identified defendant's photograph and told the detective she was 80% certain of her selection—was not electronically recorded and does not appear to have been documented verbatim in accordance with Rule 3:11.

I.

In April 2016, an Ocean County Grand Jury charged defendant with (1) first-degree robbery, N.J.S.A. 2C:15-1; (2) fourth-degree theft, N.J.S.A. 2C:20-3(a); (3) third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); (4) fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d); and (5) third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2).

---

[1] United States v. Wade, 388 U.S. 218 (1967); State v. Henderson, 208 N.J. 208 (2011).

Before trial, defendant moved for a <u>Wade-Henderson</u> hearing to examine the robbery victim's photo-array identification. The court denied defendant's motion.

Defendant was tried before a jury in October 2017. The jury convicted defendant of all charged offenses. Defendant subsequently moved for a new trial, which the court denied.

The State moved to sentence defendant to an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). Subsequently, the State moved to sentence defendant to a mandatory extended term pursuant to N.J.S.A. 2C:43-7.1(b), which is sometimes referred to as the "three strikes" law. The trial court granted the State's application for a discretionary extended term as a persistent offender. The court denied the motion for the mandatory extended term under N.J.S.A. 2C:43-7.1(b) because the State had failed to notify defendant of his eligibility for the mandatory extended term at the time of the plea cutoff. The trial court sentenced defendant to an aggregate term of twenty-five years in state prison subject to NERA.

## II.

We summarize the facts relevant to this appeal that were adduced at trial. On January 29, 2016, at around 9:40 p.m., the victim was working as an assistant manager at a Dollar Tree store. She was behind the cash register

when a man wearing a gray hooded sweatshirt with stripes entered the store. The man had the sweatshirt hood on, and his hands were in his pockets. The victim estimated she was able to look at the man's face for around a minute. She described his face as "kind of hollow, like dark eyes, [with] a little . . . facial hair."

The man walked towards the cash register and reached for a candy bar. The victim again looked at his face. As she began to scan the candy bar, the man maneuvered behind her, pressed a knife against her back, and ordered her to open the register.

She fumbled with the register and was unable to open it. The man told her that if she tried to call the police, he would stick her with the knife. She tried to reach behind her back with her right hand to pull the knife away, but the man pressed the knife further into her back. She told him, "please don't."

When it became evident she could not open the register, the man pushed her aside and ripped the drawer from the register. He then walked out of the store, carrying the drawer with him.

The police were dispatched to the Dollar Tree in response to a 9-1-1 call made by a customer who was in the store and witnessed the robbery. Officer Matthew Broderick arrived at the store around 9:44 p.m. As he entered the

parking lot of the shopping mall containing the Dollar Tree, he observed a sedan leaving the scene. The officer did not stop the vehicle.

At 9:45 p.m., another officer, Detective Steven Bucci, arrived at the store. By this point, the parking lot was empty and there were no customers in the store other than the gentleman who called 9-1-1. Detective Bucci interviewed the customer and the victim. They provided consistent descriptions of the robber. Bucci testified that the victim appeared shaken up and frightened. She had a small puncture wound on her back from the knife.

The manager of the store arrived at around 9:50 p.m. and observed the victim standing by the register crying. The manager determined that $234.96 had been taken from the register. She attempted to provide police with an electronic copy of the store's surveillance video but was unable to do so. Detective Bucci instead recorded the surveillance video with the camera on his cell phone.

The cash register drawer was found the following day on the side of a road. The bottom portion of the drawer was next to an empty beer can. The top half of the drawer was found twenty feet away. The police swabbed the beer can for DNA. The DNA found on the beer can did not match defendant. The police also attempted to find fingerprints on the beer can and the register drawer but were unsuccessful.

A-4644-17T1

After conducting an investigation, the police identified a suspect and prepared a photo array. The victim came to the police station on February 10—roughly two weeks after the robbery—to view the photo lineup. Detective Louis Santora, who had no involvement in the investigation, administered the identification procedure. The procedure was electronically recorded, and the recording was played for the jury.

The victim inspected six photographs in sequential order. She did not immediately identify defendant's photograph, photo #3, as depicting the robber. Rather, she remarked that the person depicted in photo #3 looked "similar" to the robber, particularly with respect to his moustache. Detective Santora terminated the identification procedure and left the room.

When he returned, the victim identified photograph #3 as the robber with 80% certainty. Because the detective thought the identification procedure had already concluded, the video camera recording the identification procedure had been deactivated. Accordingly, the victim's statement that she was 80% certain photograph #3 depicted the robber was not electronically recorded.

The Photo Identification Report fill-in form prepared by Detective Santora instructs in section 21, "You must document the exact words and gestures used by the witness to describe his/her level of confidence." In the blank space provided on the form under this section, the detective wrote "see

video," even though this portion of the identification procedure was not electronically recorded. In a supplemental report, Detective Santora explained he "reentered the room and thanked [the victim] for coming to headquarters and assisting further in the investigation. It was at this point that [she] stated she was 80% certain that the male depicted in photograph number three was the same person who robbed her." The supplemental report did not memorialize the detective's response to the victim's identification or any ensuing dialogue between the two. At trial, Detective Santora testified the victim "spontaneously uttered" she was 80% confident that photograph #3 depicted the robber.

The victim's trial testimony concerning the photo identification procedure differed from Detective Santora's version. According to the victim, Detective Santora left the photos with her when he exited the room. She testified she compared two or three of the photos for about five minutes, eventually deciding defendant was the robber.

We next summarize facts that were elicited from the victim at trial during a N.J.R.E. 104 hearing outside the presence of the jury. Prior to the victim testifying before the jury, defendant objected to the victim making an in-court identification of defendant as the robber. Defendant argued an interim identification procedure that occurred two weeks before trial was

9

impermissibly suggestive and tainted the victim's in-court identification.  The

court convened the hearing to acquire "an indication of what actually occurred

when there was an interim identification of [] defendant."   The court

considered the hearing to be a "very limited inquiry" and "not a Wade

hearing."

The victim was the only witness at the hearing.  She testified that an

assistant prosecutor or a detective contacted her and requested that she come to

court on October 2, 2017.  The victim stated that "[t]hey wanted me to see if I

identified anyone in the courtroom.  They said I could stay in court and point

out someone if I recognized them."  She clarified, however, "I didn't mean to

go into the court[room] just from the lineup outside of it."  She surmised the

purpose of this procedure was "just to prepare for trial."   This event occurred

two weeks before trial and roughly twenty-two months after the photo array

identification procedure.

The victim met with a detective and a victim advocate at the courthouse.

She sat with them in a hallway outside a courtroom.[2]  There, she observed a

line of six or seven inmates walking in the corridor.  She described at least one

---

[2]  To avoid confusion between the victim's courthouse identifications before
and at trial, we use the description "hallway identification procedure" to
distinguish this pretrial identification event from the in-court identification the
victim later made during trial in the presence of the judge and jury.  See infra
note 10 and accompanying text.

of the inmates as "Spanish" and acknowledged there could have been more than one Spanish or Hispanic inmate in the group. She testified that she was absolutely certain she recognized one of the inmates, defendant, as the robber. She also testified that no one instructed her to make an identification, and that she was told the person she had previously identified may or may not be in court. After she identified defendant, the victim left the courthouse without entering the courtroom.

After the hearing, the trial court concluded that the hallway identification procedure had not tainted the victim's ability to make an in-court identification of defendant. The court found there was nothing suggestive about the hallway event and that it did not constitute a lineup. Because the hallway identification would not be presented to the jury, the court did not consider the Henderson system variables, which it characterized as strictly "a test for . . . admissibility" of "formal identification procedures."[3]

The State did not present evidence of the hallway event to the jury. Rather, the photo array was the only out-of-court identification procedure about which the jury was told. The prosecutor showed the victim the

---

[3] Because the court deemed the Henderson system variables inapposite, the court limited defense counsel's ability to elicit testimony from the victim concerning those variables.

photograph she had selected from the array. She identified the photo as depicting the robber. She also identified defendant in the courtroom in the presence of the jury. She testified she had been 80% confident that defendant was the robber based on the photo array procedure. After seeing defendant's build and height in-person, however, she was 100% certain defendant was the robber.[4]

## III.

Defendant presents the following contentions for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING A WADE HEARING AND ADMITTING AN UNRELIABLE IDENTIFICATION.
>
>> A. THE COURT ERRED IN DENYING A WADE HEARING BECAUSE THE DEFENSE PRESENTED SOME EVIDENCE OF SUGGESTIVENESS.
>>
>> B. THE IN-COURT IDENTIFICATION SHOULD NOT HAVE BEEN ADMITTED BECAUSE IT WAS

---

[4] It is not clear whether the victim was referring to her in-person observation of defendant at trial, to her live observation of defendant two weeks earlier in the courthouse hallway, or to both events. As noted, the State did not present evidence to the jury concerning the hallway identification event. However, the victim testified at the N.J.R.E. 104 hearing that she was "a hundred percent sure" one of the inmates was the robber. As we later explain, this reasonably suggests that her newfound certitude was influenced by the hallway identification event.

TAINTED BY PRIOR IDENTIFICATION PROCEDURES, UNRELIABLE, AND UNDULY PREJUDICIAL.

1. THE IN-COURT IDENTIFICATION SHOULD HAVE BEEN EXCLUDED BECAUSE IT WAS UNDULY SUGGESTIVE, AND ITS MINIMAL PROBATIVE VALUE WAS FAR OUTWEIGHED BY ITS UNFAIR PREJUDICE.

2. THE IN-COURT IDENTIFICATION SHOULD HAVE BEEN EXCLUDED BECAUSE OF THE EQUIVOCAL NATURE OF THE OUT-OF-COURT IDENTIFICATION.

3. THE IN-COURT IDENTIFICATION MUST BE EXCLUDED BECAUSE IT WAS TAINTED BY PRIOR SUGGESTIVE OUT-OF-COURT PROCEDURES.

4. THE IMPROPER ADMISSION OF [THE VICTIM'S] IN-COURT IDENTIFICATION DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL, AND THE HARM WAS COMPOUNDED BY PROSECUTORIAL ERROR.

POINT II

INADMISSIBLE TESTIMONY ABOUT WHY DEFENDANT'S PHOTO WAS INCLUDED IN THE ARRAY AND INADMISSIBLE LAY OPINION TESTIMONY FROM THE LEAD INVESTIGATING OFFICER IDENTIFYING DEFENDANT AS THE

13

PERSON IN THE SURVEILLANCE FOOTAGE DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

A. TESTIMONY THAT POLICE CREATED THE PHOTO ARRAY CONTAINING DEFENDANT'S PHOTO BECAUSE UNIDENTIFIED "SOURCES" PROVIDED INFORMATION WAS INADMISSIBLE AND VIOLATED DEFENDANT'S RIGHT TO CONFRONTATION.

B. LAY OPINION TESTIMONY FROM THE LEAD DETECTIVE IDENTIFYING DEFENDANT AS THE ROBBER ON THE SURVEILLANCE VIDEO AND IN PHOTOGRAPHS WAS IMPROPER AND PREJUDICIAL.

POINT III

THE IMPROPER EXCLUSION OF A WITNESS'S DESCRIPTION OF A CAR LEAVING THE SCENE OF THE ROBBERY REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT IV

DEFENDANT'S EXTENDED TERM SENTENCE OF TWENTY-FIVE YEARS WITH AN 85% PAROLE DISQUALIFIER IS MANIFESTLY EXCESSIVE.

Defendant raises additional arguments in a pro se letter brief that he submitted after his appellate counsel submitted a merits brief and reply brief. Defendant's pro se letter brief does not include point headings, see R. 2:6-

14

A-4644-17T1

2(a)(1) (requiring a table of contents with point headings in a formal brief on appeal), and therefore we do not list his contentions in this section of our opinion.

We have carefully reviewed defendant's pro se letter brief and conclude that, for the most part, it reiterates arguments raised in the briefs submitted by counsel on his behalf. To the extent the pro se letter brief raises additional contentions, those contentions lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). It suffices to note that defendant additionally argues police conducted an unlawful warrantless search of the premises where he had been staying at the time he was arrested. The physical evidence in question, however, relates to other burglaries and was not introduced at the robbery trial at issue in this appeal. Defendant also claims boxes containing the files of both the prosecutor and defense that had been sitting on counsel tables were removed from the courtroom by a Sheriff's officer and stored in the jury room while the courtroom was being cleaned. Nothing in the record suggests that jurors or anyone else viewed confidential materials.

IV.

We first address defendant's contentions with respect to the various eyewitness identification procedures that were employed in this case. We begin by acknowledging certain foundational principles set forth in the

landmark Henderson decision in which the Supreme Court significantly revised the analytical framework for evaluating the admissibility of eyewitness identifications. The Court deemed reform necessary because the previous legal test and jury instructions overstated a jury's ability to evaluate identification evidence. Henderson, 208 N.J. at 218. Chief Justice Rabner, writing for a unanimous Court, articulated a four-step analysis for courts to apply in deciding whether to grant an evidentiary hearing and, if a hearing is warranted, whether to admit or suppress an out-of-court identification at trial.

"First, to obtain a pretrial hearing," the Court held, "a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." Id. at 288. Only if a defendant makes that threshold showing does the trial court proceed to the second step in the Henderson analytical paradigm. If the trial court determines a defendant has met the threshold for a hearing, "[t]he State must then offer proof to show that the proffered eyewitness identification is reliable[,] accounting for system and estimator variables." Id. at 289. At any time, the court may end the hearing and conclude that the State has shown that defendant's initial showing of suggestiveness is groundless. Ibid.

Under the third step, the defendant bears the ultimate burden at the hearing "to prove a very substantial likelihood of irreparable

misidentification." Ibid. "Fourth, if after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence." Ibid. The court nonetheless has the discretion to admit the identification evidence with appropriate, tailored jury instructions. Ibid.

To aid in assessing the reliability of an eyewitness identification, the Henderson Court outlined a non-exhaustive list of circumstances, termed "system variables," affecting the reliability of an identification that are created or controlled by law enforcement. System variables are distinguished from "estimator variables" over which law enforcement has no control such as lighting conditions, the amount of time the witness had to observe the offender, whether the witness's attention was focused on a weapon, and the degree of stress experienced by the witness. Our analysis in this case focuses on system variables, examining the manner in which the out-of-court identification procedures were conducted and the degree of suggestiveness inherent in those procedures.

V.

Defendant urges us to ban all in-court identifications, or at least to restrict in-court identifications to cases where there has been an "unequivocal"

out-of-court identification. Defendant reasons the scientific principles that necessitated the reforms achieved in <u>Henderson</u> demonstrate that in-court identifications are the product of inherently suggestive circumstances and have minimal probative value. He contends nearly all the system variables discussed in <u>Henderson</u> apply to in-court identifications, and that this traditional practice "does not comport with the post-<u>Henderson</u> legal landscape and must be updated."

The relief defendant seeks would represent a significant change to our State's eyewitness identification jurisprudence. Defendant urges us to cast aside a familiar courtroom practice that has been used for generations. Although defendant refers obliquely to a post-<u>Henderson</u> legal landscape, he cites no New Jersey authority to support his request for abolition of in-court identifications. To the contrary, we are asked to part company with well-established precedent, including <u>Henderson</u>.

Those precedents make clear that the decision to prohibit an in-court identification is made on a case-by-case basis. <u>See</u> <u>State v. Madison</u>, 109 N.J. 223, 242 (1988) (holding an in-court identification is not admissible if a "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (emphasis omitted) (quoting <u>Simmons v. United States</u>, 390 U.S. 377, 384

18

(1968))). In <u>Henderson</u>, the Court reframed the analysis in <u>Madison</u> in view of modern social science. 208 N.J. at 288. Notably, the Court did not go so far as to eliminate in-court identifications. We decline to do so as well.

We do not mean to suggest the familiar practice of having a trial witness point to the defendant sitting at counsel table is a talisman carved in stone. Chief Justice Rabner aptly recognized in <u>Henderson</u> that scientific research on human memory and the reliability of eyewitness identifications will continue to evolve. <u>Id.</u> at 219. We are not persuaded, however, that we have the evidential foundation upon which to grant the fundamental change defendant seeks. In <u>Henderson</u>, the reform of New Jersey's eyewitness identification jurisprudence was supported by an extensive report of a special master appointed by the Court to compile and evaluate the scientific evidence regarding eyewitness identifications. <u>Id.</u> at 228–29. Using that example of scientific groundwork as a benchmark, the record before us in this case is inadequate to test the validity and utility of in-court identifications.

Furthermore, we do not believe this is an appropriate case in which to decide whether to abandon an established practice given our decision to remand for an evidentiary hearing. That hearing will examine whether the victim's in-court identification was tainted by either or both the photo array and hallway identification procedures. Defendant may yet obtain the ultimate

remedy he seeks by applying existing legal principles. In these circumstances, we see no need to displace those principles.

VI.

Defendant raises several contentions with respect to the photo array identification procedure. First, he contends Detective Bucci made unduly suggestive comments to the victim when he told her that the State had developed the photo array based on information from unspecified "sources."[5] After carefully reviewing the record, we conclude the detective's introductory remarks did not taint the victim's subsequent selection of the defendant's photograph from the array. The detective's brief reference to investigative sources merely made explicit that which is implicitly understood by witnesses participating in an identification procedure, that is, there must be some reason why the police selected the photographs that were included in the array.

Henderson requires the officer administering the procedure to provide neutral pre-identification instructions. Specifically, the eyewitness must be told a photograph of the suspect may not be present in the array. Id. at 290. The witness also must be told that he or she should not feel compelled to make an identification. Ibid.

---

[5]   In section X of this opinion, we address defendant's contention that Detective Bucci's statement concerning investigative sources should not have been admitted at trial.

The electronic recording made pursuant to Rule 3:11 confirms those instructions were given to the victim at the outset of the identification procedure. We therefore conclude the detective's brief reference to unidentified investigative sources does not meet the threshold under Henderson for further exploration at a Wade-Henderson hearing. Id. at 218.

VII.

Defendant next challenges the composition of the array, arguing the "innocent filler" photographs did not sufficiently resemble defendant. Defendant claims, for example, his photograph depicts him with a fuller mustache than the persons depicted in the other photographs.[6] He also contends that two of the photographs were poorly lit.

The Court in Henderson explained, "The way that a live or photo lineup is constructed can . . . affect the reliability of an identification. Properly constructed lineups test a witness'[s] memory and decrease the chance that a witness is simply guessing." Id. at 251. The Court concluded that a photo array should contain at least five innocent fillers and should not contain more than one photograph of the suspect. Ibid. The Court also held that "a suspect should be included in a lineup comprised of look-alikes." Ibid. The Court

---

[6] We note the victim had not reported to police that the perpetrator had a full mustache. Rather, she reported the robber had scruffy facial hair.

recognized that "mistaken identifications are more likely to occur when the suspect stands out from other members of a live or photo lineup." Ibid.

The trial judge in this case reviewed the array and found that the filler photographs sufficiently matched defendant's appearance to constitute a proper array. We too have reviewed the photos and decline to substitute our judgment for that of the trial court. Although we note that some of the photos depict persons with less facial hair than shown in defendant's photo, we are satisfied the innocent filler photographs depict persons who match the description the victim had given to police. Accordingly, we see no reason to grant a further hearing with respect to the composition of the array.

## VIII.

We next address the circumstances in which the victim selected defendant's photograph from the array, announced her selection, and expressed her level of confidence. Defendant contends that Detective Santora left the array with the victim when he exited the room, allowing her to view the photographs simultaneously rather than sequentially. The victim testified at trial that Detective Santora left the photos with her, she compared two or three of the photos for about five minutes, and eventually selected defendant's photograph as depicting the robber. The detective testified at trial that he took the array with him when he left the room, believing the identification

22

procedure had been completed. The video recording supports the detective's version.

In light of the video record, we see no reason to grant a <u>Wade-Henderson</u> hearing to determine whether the victim was left unattended with the array and viewed the photographs simultaneously rather than sequentially.[7] We nonetheless are concerned that the video recording does not document the moment the victim announced her selection of a photo from the array. Nor does it document any ensuing dialogue between the victim and the detective.

The detective's description of the victim's identification in his supplemental report, moreover, does not appear to provide a verbatim account of the entire exchange between the two after the detective returned to the interview room. As we have noted, the detective testified that when he returned to the room the victim "spontaneously uttered" that she was 80% confident that one of the photographs depicted the robber. The supplemental report does not memorialize any dialogue that may have occurred after the victim made that unsolicited statement.

---

[7] We note that a simultaneous presentation method, which allows a witness to make side-by-side comparisons, is not necessarily improper and certainly is not prohibited per se. <u>See</u> <u>id.</u> at 256–58 (noting the scientific evidence concerning sequential versus simultaneous arrays had not yet resulted in a preference for one form of procedure over the other).

We do not fault the detective for turning off the camera when he believed the identification procedure had concluded. However, when he returned to the interview room and was told by the victim that she was now prepared to select a photograph depicting the robber, it would have been prudent for the detective to interrupt the dialogue, restart the recording device, and memorialize verbatim any exchange he had with her during the period when the recording device was deactivated. Those precautions would have ensured that a proper record was made in accordance with Rule 3:11.

In Henderson, the Court reaffirmed prior precedent by requiring "all lineup procedures [to] be recorded and preserved." Id. at 252 (citing State v. Delgado, 188 N.J. 48, 63 (2006)). In State v. Anthony, the Court recently amplified the need to record identification procedures, explaining:

> If a law enforcement officer does not electronically record the identification procedure or prepare a contemporaneous verbatim account of the exchange, the defendant may not learn about confirmatory feedback or other suggestive behavior. Without that critical information, he or she may not be able to get a hearing under the current standard -- as happened in this case.

> Stated another way, defendants need a full record of the identification procedure to gather possible evidence of suggestiveness. The failure to provide that information should not deprive defendants of the opportunity to probe about suggestive behavior that may have tainted an identification.

[237 N.J. 213, 233 (2019).]

To address that situation, the Court in <u>Anthony</u> modified the <u>Henderson</u> framework, holding a defendant is "entitled to a pretrial hearing on the admissibility of identification evidence if <u>Delgado</u> and <u>Rule</u> 3:11 are not followed and no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared." <u>Ibid.</u> "In such cases," the Court ruled, "defendants will not need to offer proof of suggestive behavior tied to a system variable to get a pretrial hearing." <u>Id.</u> at 233–34.

We interpret <u>Anthony</u> to apply to the entire identification procedure, including the victim's selection of a photograph and any exchange between the victim and detective following the selection. <u>See Rule</u> 3:11(c) (explaining the record of an out-of-court identification procedure must include details of what occurred, including the dialogue between the witness and the officer and the results of the identification procedure). As noted, it does not appear the detective's supplemental report provides a detailed account of the entire dialogue that occurred after he returned to the room and while the video recorder was turned off. <u>See R.</u> 3:11(b) (requiring a written record of an out-of-court identification procedure to include "a detailed summary of the identification" if it is infeasible for the law enforcement officer to provide a "verbatim account of any exchange between the . . . officer . . . and the

witness"). The supplemental report suggests the detective said nothing to the victim after she spontaneously announced she was 80% certain that one of the photographs depicted the robber. It seems to us unlikely those were the last words spoken during the identification procedure.

In view of the revised threshold standard adopted in Anthony, we remand for the trial court to convene an evidentiary hearing. We instruct the court to make detailed findings with respect to the results of the identification procedure, the entire dialogue between the victim and the detective after he returned to the interview room, and any other aspect of the photo array identification procedure the court deems relevant.

For purposes of providing guidance to the remand court, we note the Court in Anthony rejected a bright-line rule that would bar identification testimony in the absence of strict compliance with Rule 3:11. 237 N.J. at 239. Recognizing that "[t]he threshold for suppression remains high," ibid. (alteration in original) (quoting Henderson, 208 N.J. at 303), the Court requires defendants to show "a very substantial likelihood of irreparable misidentification," ibid. (quoting Henderson, 208 N.J. at 289).

We add that in Henderson, the Court noted, "the court can end the hearing at any time if it finds from the testimony that defendant's threshold allegation of suggestiveness is groundless." 208 N.J. at 289. Applying that

principle to the revised threshold in <u>Anthony</u>, the trial court on remand may in its discretion end the hearing with respect to the photo array procedure if it finds the supplemental report in fact recounted verbatim the entire exchange between the detective and the victim after he returned to the room, provided no evidence of suggestiveness has been demonstrated by the evidence. <u>Id.</u> at 290–91.

## IX.

We next address the unusual event that occurred in a courthouse corridor. As noted, the victim was asked to come to the courthouse to view a line of county jail inmates who paraded past her as she sat in the hallway outside a courtroom. We are not familiar with this procedure and have concerns about its potential suggestiveness. Importantly, this planned identification event was not electronically recorded, no contemporaneous verbatim account was made, no photograph of the inmates was presented, and the trial court limited defense counsel's opportunity to question the victim concerning system and estimator variables. The present record, moreover, does not adequately document the pre-procedure instructions that were given to the victim, the physical attributes of the other county jail inmates who served functionally as "innocent fillers," the victim's contemporaneous statements regarding her level of confidence, and the dialogue between the

27

victim and the representatives from the prosecutor's office before, during, and after the identification event. We do not know whether the detective and victim advocate who accompanied the victim were "double blind" or "blind" administrators[8] and whether they provided confirmatory feedback.

A.

In Henderson, the Court admonished "we must strive to avoid reinforcement and distortion of eyewitness memories from outside effects." 208 N.J. at 295. The Court recognized that information received by witnesses both before and after an identification can affect their memory. Id. at 253. The Court also recognized that viewing a suspect more than once during an investigation can affect the reliability of the later identification. Id. at 255. Successive views, the Court explained, "can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure." Ibid. In this instance, the hallway event occurred roughly two years after the robbery and photo array procedure and two weeks before trial. The timing underscores the possibility that the

---

[8] The Court explained in Henderson that an identification may be unreliable if the lineup procedure is not administered in double-blind or blind fashion. 208 N.J. at 248–50. "Double-blind administrators do not know who the actual suspect is." Id. at 248. "Blind administrators are aware of that information but shield themselves from knowing where the suspect is located in the lineup or photo array." Ibid.

victim's in-court identification stems from her memory of the hallway event rather than from her recollection of the robbery or the photo array identification procedure.

As we have noted, the hallway event was not submitted for the jury's consideration.[9]  The State cannot avoid the consequences of a potentially suggestive identification procedure, however, simply by choosing not to introduce evidence of its occurrence.  Suppression of an out-of-court identification procedure, after all, is not the only potential remedy for an impermissibly suggestive procedure that has the potential to corrupt a witness's memory.  Such a procedure could also place at risk the admissibility of a subsequent in-court identification.

The unusual hallway event must therefore be examined carefully because it bears on the admissibility of the victim's in-court identification during which she professed to be 100% certain defendant was the culprit.  In <u>Madison</u>, the Court held an in-court identification is not admissible if a "photographic

---

[9] We note the potential prejudice that would have arisen had the jury been told of defendant being led in jail garb and restraints into a courtroom.  <u>See</u> <u>State v. Grant</u>, 361 N.J. Super. 349, 358 (App. Div. 2003) (noting the inherent prejudice from permitting a jury to see a defendant in handcuffs or shackles can constitute reversible error (citations omitted)).  We add that defense counsel faced a dilemma in deciding whether to argue to the jury the hallway event was suggestive and influenced the victim's recollection of the robber since that would have revealed defendant's pretrial custody status.

A-4644-17T1

identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 109 N.J. at 242 (emphasis omitted) (quoting Simmons, 390 U.S. at 384). We have no doubt this longstanding principle, which was left unchanged in Henderson, applies as well to impermissibly suggestive live lineups and showups.

We add the Court in Henderson recognized that judicial scrutiny "promotes deterrence in a meaningful way," 208 N.J. at 288, and that "probing pretrial hearings about suggestive police procedures . . . can deter inappropriate police practices," id. at 294. Meaningful judicial review can, for example, provide incentives for prosecutors to ensure that any pretrial viewings like the one that occurred in this case are conducted carefully, mindful of suggestiveness tied to system variables, and are fully documented. We trust our decision to remand this case for a fulsome Wade-Henderson hearing, notwithstanding the prosecutor's decision not to introduce evidence of the hallway event to the jury, will put law enforcement on notice that such planned pretrial viewings may be subject to judicial review even if done only for the purpose of trial preparation. See discussion infra Section IX.B.

B.

We next address whether the hallway event is an out-of-court identification procedure subject to the requirements and remedies set forth in

case law and <u>Rule</u> 3:11. At oral argument, the prosecutor described the event as "trial prep." The State cites no authority, however, for the proposition that <u>Henderson</u> and its case law progeny do not apply to identification procedures that are intended to prepare a witness for an impending trial. The Court in <u>Henderson</u> focused on the science of human memory, not the prosecutor's underlying reasons for arranging for a pretrial view of a defendant, when it cautioned that such views "can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure." 208 N.J. at 255. An in-person viewing can affect a witness's memory regardless whether the prosecutor who arranged the viewing intended to introduce evidence of the event at trial.

It bears emphasis this was not a situation where the prosecutor met with the victim shortly before trial to refresh her recollection of her prior statements and the selection she made and confidence level she expressed during the photo array procedure. Rather, the hallway event was essentially a new identification procedure, reflecting, ostensibly, the prosecutor's efforts to secure a higher confidence level than the one the victim expressed at the conclusion of the photo array procedure. <u>See</u> <u>infra</u> note 11.

In the particular circumstances of this case, therefore, we do not embrace the State's "trial prep" characterization if the prosecutor means to suggest the

hallway event falls outside the scope of Rule 3:11 and cases that address the reliability of eyewitness identifications. We add that before the jail inmates were brought into the corridor, the victim was told the person she had identified in the photo array lineup may or may not be among them. In view of this apparent homage to this required feature of an out-of-court identification procedure, see Henderson, 208 N.J. at 250 (setting forth pre-identification instructions for identification procedures), the State is hard pressed to suggest that this prosecutor-arranged viewing was not an identification procedure subject to scrutiny under Henderson, Anthony, and Rule 3:11.[10]

That Court Rule, which was promulgated by the Supreme Court to implement the principles set forth in Henderson, refers broadly to out-of-court identifications "resulting from a photo array, live lineup, or showup identification procedure conducted by a law enforcement officer." R. 3:11(a). We believe this list is intended to be exhaustive, covering the entire universe

---

[10] We also reject any notion this was an "in court" procedure, thereby falling outside the ambit of Rule 3:11(a), which refers explicitly to an out-of-court identification. The term "in court identification" as used in our case law refers to an identification made by a witness at trial on the record and in the presence of the judge and jury. That term does not apply to eyewitness identifications that happen to be made inside a courthouse but outside the presence of the judge and jury. For purposes of evaluating system variables and suggestiveness, we see no meaningful distinction between a live lineup or showup conducted in a courthouse corridor and one conducted in a police station or prosecutors office.

of events at which eyewitnesses are asked by police or prosecutors whether they can recognize and point out the perpetrator by observing one or more individuals either in-person or by means of photographs.

In this instance, a representative from the prosecutor's office asked the victim to come to the courthouse for the purpose of viewing defendant and other persons who were in law enforcement custody. The objective was to see if the victim could recognize the robber in person. Perhaps it was a dress rehearsal for an in-court identification at the impending trial. Representatives from the prosecutor's office accompanied the victim during that viewing process.[11] Although the record is not clear as to her exact response upon viewing defendant, the victim reported to the representatives that she positively identified defendant as the robber. In these circumstances, we conclude the event was an "identification procedure conducted by law enforcement" within the meaning and intended scope of Rule 3:11(a).

---

[11] As noted, the prosecutor at the limited N.J.R.E. 104 hearing did not present testimony from the representatives from the prosecutor's office who contacted the victim and accompanied her in the courthouse corridor. Based on the victim's hearing testimony that she was asked by an assistant prosecutor or detective to come to the courthouse on a specific date to see if she could recognize the perpetrator, we presume the event was conceived and orchestrated by the prosecutor's office to enhance her trial testimony by bolstering her prior photo array identification.

Labels aside, the law enforcement-initiated observation event that occurred in the courthouse corridor reasonably appears to have bolstered the victim's confidence in her prior identification of the robber. At the conclusion of the earlier photo array procedure, the victim was only 80% certain the photograph she selected depicted the robber. At trial, she testified she was 100% positive of her in-court identification.

As the Court aptly noted in Henderson, "Memories fade with time. . . . [M]emories never improve." 208 N.J. at 267. We acknowledge that a witness may become more certain of his or her identification after seeing a person live in the courtroom during a true in-court identification. Perhaps that happened in this case and explains the marked upsurge in the victim's level of confidence. But as we have already noted, the victim acknowledged in her N.J.R.E. 104 hearing testimony, which preceded her formal in-court identification, that she was absolutely certain one of the inmates was the robber. We therefore believe it is a fair inference, if not an inescapable one, the hallway viewing influenced the victim's confidence in her identification.

The trial judge at the conclusion of the N.J.R.E. 104 hearing determined the hallway encounter had no impact on the victim's ability to make a traditional in-court identification. We believe that determination was premature. Had the State sought to introduce evidence of the victim's hallway

identification, the inherent suggestiveness of the identification procedure would have required the State under the second step in the Henderson framework to "offer proof to show that the proffered eyewitness identification is reliable[,] accounting for system and estimator variables." Id. at 289. The potential influence of the hallway identification procedure on the victim's in-court identification leads us to conclude the State likewise bears the burden here to offer proof as to what transpired and what system variables were in play. The record developed at the N.J.R.E. 104 hearing was inadequate, however, to permit us to examine the level of suggestiveness and the impact of system variables on the victim's memory. See supra note 3.

We reject as irrelevant the State's argument the victim had the right to attend court proceedings.[12] That argument misses the point. No one disputes a victim has a right to attend pretrial hearings. That right, subject to a trial sequestration order, is guaranteed both by Article I, paragraph 22 of the New Jersey Constitution and by the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-36(r). In this case, however, it seems plain the victim was not exercising her right to attend court proceedings as she waited in the hallway for a line of inmates to walk by. As noted, she never actually entered a courtroom. Rather,

---

[12] We likewise dismiss as inapposite the State's argument that citizens-at-large have the right to enter a courthouse and attend court proceedings that are open to the general public.

it reasonably appears the event in the courthouse corridor was conceived, initiated, and implemented by the prosecutor or police for the purpose of strengthening the State's case.[13]

In these circumstances, we hold this planned viewing was subject to the recordation requirements of Rule 3:11. As we have already noted, in Anthony, the Court recently held that a defendant is entitled "to a pretrial hearing on the admissibility of [the] identification evidence if . . . Rule 3:11 [is] not followed and no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared." 237 N.J. at 233. The Court made clear that defendants need not offer proof of suggestiveness in order to obtain this remedy. Id. 233–34.

---

[13] We recognize there may be instances when a victim exercises the right to attend pretrial proceedings and thus has an opportunity to observe a defendant in jail garb after an out-of-court identification procedure and before trial. What distinguishes those events from the hallway viewing that occurred in this case is that they are not conducted and controlled by police or prosecutors. We add that providing routine notice to victims of scheduled court events does not raise the same concerns. We believe there is a marked difference between advising a victim about a court hearing they may choose to attend on the one hand and asking the victim to come to the courthouse so that he or she can view the defendant in person to confirm or bolster an earlier identification on the other hand. In any event, we need not speculate about various scenarios where a crime victim may happen to view a defendant before trial. In the particular circumstances of this case, we believe the in-person viewing in the courthouse corridor was a planned out-of-court identification procedure conducted by law enforcement and thus subject to the recording requirements of Rule 3:11.

We believe that revised threshold standard, designed in part to encourage compliance with Rule 3:11, applies in this case, recognizing that the issue before us is not whether the hallway event is admissible but rather whether it impermissibly tainted the victim's memory and subsequent in-court identification. We therefore conclude an evidentiary hearing is required to identify and evaluate all applicable system variables so that the trial court can determine based on a fulsome record whether this novel identification procedure may have tainted the victim's memory and subsequent in-court identification.

As noted, the trial court described the N.J.R.E. 104 hearing as only a "limited inquiry" and "not a Wade hearing." In the circumstances of this case, we apply the reasoning in Anthony to require a new hearing to fill in the gaps resulting from the State's failure to contemporaneously document what transpired. We add that even without the new threshold spelled out in Anthony, we would deem it necessary to convene a more fulsome evidentiary hearing applying the threshold test established in Henderson. The current record presents some evidence of suggestiveness that could lead to a mistaken identification. Henderson, 208 N.J. at 288. We presume, for example, defendant was wearing a county jail jumpsuit and was in handcuffs and shackles as he was being transported from the jail to a courtroom.

We further emphasize the admonition in <u>Henderson</u> that "a biased lineup may inflate a witness'[s] confidence in the identification because the selection process seemed easy" and that "mistaken identifications are more likely to occur when the suspect stands out from other members of a live or photo lineup." <u>Id.</u> at 251. It is not certain on the record before us whether and to what degree defendant stood out from the other inmates.[14] We note defendant was more than fifty years old and stands six feet-two inches tall with a thin build. Those physical characteristics may have readily distinguished him from the other inmates lined up in the hallway. As we have noted, the victim testified she became certain defendant was the robber after observing his height and build, suggesting those physical traits were especially significant.

The current record also fails to disclose whether the detective or victim advocate who accompanied the victim provided confirmatory feedback, either during or immediately following the hallway procedure or at some other time

---

[14]  The State at the N.J.R.E. 104 hearing did not present a photograph of the group of inmates who paraded past the victim along with defendant. <u>See</u> <u>R.</u> 3:11(c)(4) (requiring that the record of an out-of-court identification, if a live lineup, include a picture of the lineup). The limited evidence suggests at least one of the other inmates was Spanish, to use the victim's characterization. The record before us is inadequate, however, to determine whether the other inmates resembled defendant aside from them all wearing county jail jumpsuits.

prior to the victim's in-court identification. These and related questions require further exploration, explanation, and evaluation.

C.

The Court noted in <u>Henderson</u> that appellate review remains a backstop to correct errors that may not be caught at or before trial. 208 N.J. at 295. Although we have the authority under <u>Henderson</u> to determine that identification evidence should not have been admitted and to reverse a conviction, <u>ibid.</u>, we decline to exercise original jurisdiction in this case, <u>see</u> <u>State v. Micelli</u>, 215 N.J. 284, 293 (2013) (holding the Appellate Division panel improperly exercised original jurisdiction by weighing evidence and making factual findings pertaining to a <u>Wade</u> hearing (citing <u>Cannuscio v. Claridge Hotel & Casino</u>, 319 N.J. Super. 342, 347 (App. Div. 1999))). There are important questions that cannot be answered from the limited evidence adduced at the N.J.R.E. 104 hearing. We therefore remand this matter for the trial court to conduct a new evidentiary hearing to reconstruct to the greatest extent feasible what happened in the courthouse corridor, to identify and assess all applicable system variables, and to determine whether the procedure was

unduly suggestive and corrupted the victim's memory, applying the principles set forth in Henderson.[15]

We deem it to be especially important for the trial court to determine whether the composition of the live lineup was fair and unbiased. We recognize it may be logistically difficult for the prosecutor to ascertain the physical appearance of the other inmates the victim observed in the corridor alongside defendant. If so, that would be the direct result of the prosecutor's failure to electronically record the event or at least take a still photograph of the live lineup, see R. 3:11(c)(4), and would not change the State's burden of production on remand.

We add it is conceivable the prosecutor did not select "look-alikes" to appear along with defendant. See Henderson, 208 N.J. at 251 (instructing "a

---

[15] The trial court on remand, in its discretion, may utilize any remedy offered in Rule 3:11(d). That section provides:

> If the record that is prepared is lacking in important details as to what occurred at the out-of-court identification procedure, and if it was feasible to obtain and preserve those details, the court may, in its sound discretion and consistent with appropriate case law, declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification.
>
> [Ibid.]

suspect should be included in a lineup comprised of look-alikes"). Rather, the prosecutor may have relied on the court calendar to determine, essentially by chance, which inmates would be transported from the jail to the courtroom along with defendant. It is possible, in other words, the hallway procedure was not designed to have the victim view different individuals who resemble each other so much as to provide an opportunity for the victim to view defendant in person before trial.

In that event, the procedure would share many of the characteristics of a "showup" identification where no effort is made to provide innocent fillers who resemble the suspect, where the suspect is clearly in law enforcement custody, and where the procedure cannot be performed double blind or blind. 208 N.J. at 259–61; see also supra note 8. The Court in Henderson cautioned that showups are inherently suggestive and should be conducted within two hours of the crime. 208 N.J. at 261. Applying that temporal benchmark, conducting the functional equivalent of a showup identification nearly two years after the crime could be problematic, to say the least.

The court on remand shall make detailed findings of fact and law to permit appellate review if needed. At a minimum, the court must make findings concerning: (1) pre-procedure instructions that were given to the victim; (2) whether the detective and victim advocate accompanying the victim

met the standard of double blind or blind administrators; (3) the number and appearance of other county jail inmates the victim observed and whether defendant stood out in terms of height, weight, race, ethnicity, age, hairstyle and facial hair, and any other distinguishing physical characteristics; (4) whether defendant and the other inmates were wearing jail garb and were in physical restraints; (5) the degree of confidence the witness expressed in her identification; (6) the verbatim dialogue between the witness and the detective and victim advocate throughout the procedure; (7) whether there was any confirmatory feedback expressed by anyone at any time before the witness's appearance at trial, including after the hallway procedure was concluded; and (8) any other facts or circumstances the court deems relevant.

We reiterate that although the State must offer proof at the remand hearing, defendant bears the ultimate burden of persuasion. Id. at 289. As we have already noted, the threshold for suppression of the in-court identification is high, id. at 303, and to obtain that relief, defendant must show "a very substantial likelihood of irreparable misidentification," id. at 289.

In applying that standard, we recognize the trial court no longer has the option to fashion an appropriate jury charge to explain how the jury should assess the impact of the hallway identification on the victim's memory and her subsequent in-court identification. See R. 3:11(d) (offering trial courts

multiple remedies for failures to record identification procedures, including the fashioning of appropriately tailored jury instructions). If the trial court determines that identification evidence should not have been admitted without an appropriate jury instruction, it shall vacate the convictions and order a new trial.

## X.

Defendant contends for the first time on appeal that Detective Bucci violated his Confrontation Clause rights by relaying inadmissible hearsay concerning the description of the suspect developed from the State's investigation. The electronic recording of the photo array identification procedure was played to the jury. In that recording, Detective Bucci told the victim the photo array was developed based on "information[] [that had] been coming in from different sources."[16] Detective Bucci also testified at trial that after speaking with various witnesses and viewing the surveillance video recording of the robbery in the course of his investigation, he developed a description of the suspect as a "[w]hite male, scruffy face, . . . unshaven look. He was about six foot two, thin build and obviously we had a clothing description."

---

[16] In Section VI of this opinion, we have addressed defendant's contention the detective's statement to the victim concerning "other sources" improperly suggested to her that a photograph of the robber was in the array.

In State v. Branch, the New Jersey Supreme Court acknowledged "[t]he Confrontation Clause does not condemn all hearsay." 182 N.J. 338, 349 (2005) (citing Crawford v. Washington, 541 U.S. 36 (2004)). "A defendant's confrontation right must accommodate 'legitimate interests in the criminal trial process,' such as established rules of evidence and procedure designed to ensure efficiency, fairness, and reliability of criminal trials." Ibid. (quoting State v. Garron, 177 N.J. 147, 169 (2003)). The Supreme Court draws the line between admissible testimony and testimony that violates the Confrontation Clause at the point where the testimony either directly incriminates a defendant or creates an "'inescapable inference' that an unavailable source has implicated the defendant." State v. Medina, ___ N.J. ___ (2020) (slip op. at 24) (quoting State v. Bankston, 63 N.J. 263, 271 (1973)).

After carefully reviewing the record, we conclude that neither Detective Bucci's live trial testimony nor the electronically recorded explanation he gave during the photo array procedure improperly conveyed to the jury that he "possesse[d] superior knowledge . . . that incriminates . . . defendant." Branch, 182 N.J. at 351. Although greater care might have been taken to ensure that the detective did not impliedly suggest there were other unspecified "sources" of information besides the store surveillance video and the witnesses who testified, his testimony did not create an "inescapable inference" that an

unavailable source had implicated the defendant. <u>Medina</u>, ___ N.J. at ___ (slip op. at 24) (quoting <u>Bankston</u>, 63 N.J. at 271). Furthermore, his brief reference to "different sources" does not rise to the level of plain error under <u>Rule</u> 2:10-2. Defendant's decision not to lodge a contemporaneous objection to the detective's testimony supports that conclusion. <u>See</u> <u>State v. Tierney</u>, 356 N.J. Super. 468, 481 (App. Div. 2003) ("Defendant's failure to 'interpose a timely objection constitutes strong evidence that the error belatedly raised . . . was actually of no moment.'" (quoting <u>State v. White</u>, 326 N.J. Super. 304, 315 (App. Div. 1999))).

## XI.

We next address defendant's contention that Detective Bucci impermissibly intruded upon the jury's province as factfinder by identifying defendant at trial as the perpetrator shown in the store surveillance video. Defense counsel objected to the detective's statement, and the court gave the following curative instruction:

> [T]he video speaks for itself. You are the judges of the facts in this matter and you should draw your own conclusions as to what that video shows and you should disregard any conclusions that Detective Bucci may have made . . . during his narrative regarding what that video shows.

We agree with defendant that Detective Bucci's lay opinion testimony as to what was shown in the video was improper and should not have been

admitted. We nonetheless conclude the trial court's timely instruction cured any prejudice resulting from the detective's opinion as to who was depicted in the video recording played to the jury.

Defendant further argues for the first time on appeal that the detective compounded the initial error when he again identified defendant as the robber in still photographs taken from the video. Detective Bucci also commented that a "mustache" was visible on the robber in one of the screen shots. This time, defense counsel did not object.

The detective should not have been permitted to offer his opinion with respect to what was depicted in the screen shots admitted into evidence for the same reason his opinion testimony was inappropriate with respect to the video. We nonetheless are satisfied that the court's curative instruction made clear to the jury it was for them to decide what the store security recording showed, whether viewed as a motion picture or as a series of selected still frames. The jurors were able to inspect the photographs themselves and decide "whether the person in [the] photograph [was] . . . defendant." State v. Lazo, 209 N.J. 9, 23 (2012). Accordingly, we do not believe the detective's testimony relating to the screen shots constitutes plain error capable of producing an unjust result, especially given the absence of a request for a supplemental curative instruction. R. 2:10-2.

XII.

We turn next to defendant's contention the trial court improperly precluded defense counsel from asking Detective Bucci about a statement that had been made to him by the customer in the Dollar Tree store. The eyewitness to the robbery told the officer he had observed a sedan leaving the parking lot.[17] The trial judge rejected defendant's argument the statement was admissible as an excited utterance under N.J.R.E. 803(c)(2). We conclude the trial judge acted within his discretion in excluding this hearsay statement. See State v. Scott, 229 N.J. 469, 479 (2017) ("[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." (alteration in original) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383–84 (2010))).

An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or

---

[17] Defendant contends evidence concerning the sedan leaving the parking lot is exculpatory because police believed defendant used a large SUV while committing other burglaries. However, defendant did not present this argument to the jury even though dashcam video played to the jury showed a sedan leaving the parking lot when police arrived in response to the 9-1-1 call. We presume this was a tactical decision by the defense not to place before the jury that defendant was a suspect in other burglaries.

A-4644-17T1

fabricate." N.J.R.E. 803(c)(2). In determining whether a declarant had the opportunity to deliberate,

> we look to a number of factors, including the shock effect of the [robbery], the time elapsed between that event and [the] statement, the continuing influence of the excitement caused by the [robbery], the circumstances surrounding the taking of the statement, and whether the statement was in response to questions.
>
> [Branch, 182 N.J. at 366 (citing Riley v. Weigand, 18 N.J. Super. 66, 73 (App. Div. 1952)).]

The trial court found the customer relayed the information to the officer at least seven minutes after the robbery and after other officers had the opportunity to speak with him. We find no abuse of discretion in the trial court's finding that the seven-minute period of delay was sufficient to provide the eyewitness with the opportunity to deliberate. See id. at 344, 366–67 (concluding that a ten-minute delay between a burglary and robbery and a statement provided sufficient opportunity to deliberate); Gonzales v. Hugelmeyer, 441 N.J. Super. 451, 458 (App. Div. 2015) (excluding a statement made at least "several minutes" after an accident); State v. Belliard, 415 N.J. Super. 51, 88 (App. Div. 2010) (affirming the court's exclusion of a statement made four to five minutes after an exciting event).

We add that defendant's contention that he was prejudiced by the trial court's decision to exclude the hearsay statement is meritless because that

statement would merely have corroborated the dashcam video recording that showed a sedan leaving the Dollar Tree parking lot. See supra note 17. Accordingly, the trial court's evidentiary ruling did not preclude counsel from arguing that defendant did not commit the robbery because he drove a large SUV rather than a sedan.

## XIII.

### A.

Defendant challenges his twenty-five-year extended-term sentence on several grounds. He first contends the trial court erred in relying on the presentence report to establish that he was eligible for an extended term as a persistent offender under N.J.S.A. 2C: 2C:44-3(a).[18]

As a general matter, we review sentences under an abuse of discretion standard. State v. Pierce, 188 N.J. 155, 166 (2006). Whether a defendant meets the statutory eligibility criteria for an extended-term sentence, however, is a question of law we review de novo. Ibid.

---

[18] Pursuant to N.J.S.A. 2C:44-3(a), a defendant qualifies for an extended term as a persistent offender if he or she is more than twenty-one years old at the time of the instant offense, "has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least [eighteen] years of age," and "the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced."

The trial court found defendant eligible based on his age at the time of the present offense (fifty-two years old) and his record of at least two predicate convictions,[19] specifically a conviction for second-degree aggravated assault in 1989 and a conviction for second-degree robbery in 2004.[20]

Defendant is hard-pressed on appeal to challenge his eligibility for the persistent offender extended term given that counsel acknowledged at sentencing that the requirements set forth in N.J.S.A. 2C:44-3(a) were met. The trial court asked counsel, "Do you agree that . . . under the statute . . . that [defendant] just based on his predicated offenses . . . meets the . . . time limitations, the predicate offenses and the age requirement?" Defense counsel responded, "Yes, your Honor. . . . He is over [twenty-one] clearly and he does have the predicate offenses necessary for the discretionary extended term."

Counsel clarified that the defense argument was not that defendant was ineligible for an extended term as a persistent offender, but rather that the court should exercise its discretion and refrain from imposing an extended

---

[19] The trial court noted there were more than two predicate offenses listed in defendant's presentence report. Indeed, the court noted defendant has a total of forty-one adult criminal convictions.

[20] Defendant's conviction in October 2004 for second-degree robbery resulted in a five-year term of imprisonment with a four-year, three-month term of parole ineligibility. Thus, defendant was released sometime in 2009, establishing that he was last released from confinement within ten years of the commission of the present offenses in January 2016.

term. We conclude defendant meets the definition of a persistent offender. We also believe the sentencing court did not abuse its discretion in sentencing defendant within the extended term range.

B.

We turn next to defendant's contention that the sentencing court abused its discretion in finding and weighing the applicable aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1. Specifically, defendant contends the court erred in ascribing weight to aggravating factor three (risk that defendant will commit another offense) based in part on defendant's history of substance abuse. Defendant also contends the sentencing court should have found mitigating factors nine (character and attitude of defendant indicate he is unlikely to commit another offense) and eleven (imprisonment would entail excessive hardship to defendant or his dependents) because of his health problems and his status as a father.

As we have already noted, a trial court's sentencing determination is entitled to deference. In State v. Fuentes, the Court explained:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

51

[217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)).]

The record shows the sentencing court found a risk of recidivism under aggravating factor three based on defendant's substance abuse history, his history of employment, and his extensive criminal record. We do not believe the court erred in considering defendant's history of substance abuse as indicating the likelihood that he would continue to commit offenses. But even putting aside the correlation between substance abuse and criminal behavior, the lengthy list of defendant's prior criminal convictions for burglary, theft, receiving stolen property, and robbery amply supports the court's decision to assign "very heavy weight" to aggravating factor three.

We likewise reject defendant's contention the trial court abused its discretion in declining to find mitigating factors nine and eleven. As to mitigating factor nine, the court was unpersuaded by defendant's contention that his poor health (defendant had heart surgery in 2015 and is at risk of a heart attack in the future) and mature age (defendant was in his mid-50s at the time of sentencing) demonstrate a low risk of recidivism. The sentencing court aptly noted defendant's health issues existed at the time of the instant offenses and did not prevent him from committing a first-degree robbery. We add that defendant's latest crime was by no means a youthful indiscretion. He

was fifty-two-years old when he committed the armed robbery.  There is no reason to believe defendant has outgrown his penchant for criminality.

As to mitigating factor eleven, the court rejected defendant's argument that imprisoning him would pose an undue hardship based on his poor health and his status as a father of three children between the ages of eight and nine. The court found that defendant had presented no evidence that our State's prison system could not provide adequate care for his heart condition.  See State v. M.A., 402 N.J. Super. 353, 372 (App. Div. 2008) (holding the court did not err in failing to address mitigating factor eleven when the defendant "was functioning at a reasonable level; he was undergoing active treatment; and there was nothing in the record indicating his needs could not be adequately met in prison" (emphasis added)).  We also find unpersuasive defendant's argument about the hardship imprisonment would cause his family. As the sentencing court noted, defendant's extensive history of incarceration has prevented him from acting as a residential custodian and from supporting his children.

We likewise reject defendant's contention the twenty-five-year aggregate sentence is manifestly excessive or shocks the judicial conscience.  State v. Case, 220 N.J. 49, 65 (2014) (refusing to second-guess the sentencing court, "provided that the sentence does not 'shock the judicial conscience" (quoting

Roth, 95 N.J. at 365)). To the contrary, we believe the sentence imposed is appropriate in view of defendant's extensive criminal history and the manner in which he terrorized the present victim with a knife.

XIV.

To the extent we have not already addressed them, any additional arguments raised by defendant in his counseled and pro se briefs lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(2).

We remand for the trial court to conduct a new evidentiary hearing and to make findings of fact and law consistent with sections VIII and IX of this opinion. If, for example, the court concludes, considering all applicable system variables, the victim's in-court identification was tainted and should not have been introduced, or that it should only have been introduced with appropriately tailored instructions to the jury, the court shall vacate the convictions and order a new trial. In all other respects, we affirm defendant's convictions and sentence.

Affirmed in part and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4644-17T1